UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CR-291-1

FILED
SEP 04 2012
JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC
BY ___KM___ DEP CLK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | Fed. R. Crim. P. 7 |
| WILLIAM LARRY ROGERS | ) | |

THE UNITED STATES ATTORNEY CHARGES:

COUNT ONE
(Conspiracy to Make Material False Statements,
to Commit Mail Fraud and Wire Fraud, and
to Obstruct Justice, 18 U.S.C. § 371)

INTRODUCTORY STATEMENT

1. WILLIAM LARRY ROGERS, defendant herein, along with farmers, warehousemen, crop insurance adjusters, and others worked together to defraud crop insurance companies of funds by filing false loss claims, to defraud the United States of America through the filing of false insurance claims ultimately reimbursed by the United States Department of Agriculture, to make material false statements in connection with the Federal Crop Insurance program, and to launder the proceeds and profits of the underlying fraud.

STATUTORY AND REGULATORY BACKGROUND

2. In 1938, Congress passed the Federal Crop Insurance Act (hereinafter referred to as the "Act"), 7 U.S.C. § 1501 et seq., in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

3. In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation (hereinafter referred to as "FCIC"), 7 U.S.C. § 1503, which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of United States Department of Agriculture (hereinafter referred to as "USDA"), 7 U.S.C. § 1508. Tobacco, corn, soybeans, and wheat were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

4. The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with an insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such unavoidable events caused the harvest for the farm to be less than the amount specified in the insurance contract, or written policy agreement. The insurance contract or written policy agreement, and premiums of coverage, are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN").

5. By delegated authority, the Secretary of USDA issued regulations governing the federal crop insurance program. 7 C.F.R. § 400 et seq.

6. Since 2004, farmers have been required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under the policy.

7. Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold, and the cause of loss.

8. As statutorily mandated, the Secretary of USDA established the Risk Management Agency ("hereinafter referred to as "RMA"), an agency of the USDA, to supervise the FCIC and to administer all programs authorized under the Act. 7 U.S.C. § 6933.

9. By 1986, most crop insurance was sold through private insurance companies contracting with RMA. USDA reimbursed the private insurance companies for any claims paid in connection with crop losses covered by the federal crop insurance program.

10. The private insurance companies contracting with RMA must execute a Standard Reinsurance Agreement. See 7 C.F.R. §400.677.

11. At all times relevant herein, the Standard Reinsurance Agreement with RMA contained specific provisions governing conflict of interests.

12. At all times relevant herein, the Standard Reinsurance Agreement with RMA further required employees and affiliates of a company in the Federal Crop Insurance Program to submit a yearly signed statement verifying knowledge of the conflict of interest rules, and an agreement to abide by the terms of those rules.

13. The U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (Pub. L. 110-28), as amended, authorized the Secretary to provide disaster assistance to producers who suffered crop losses because of adverse weather conditions in 2005, 2006, and 2007. Regulations govern the Crop Disaster Program (hereinafter referred to as "CDP"). See 7 C.F.R. § 760 et. seq.

14. The Farm Service Agency (hereinafter referred to as "FSA") administered the 2005-2007 CDP. 7 C.F.R. § 760.801. CDP provided assistance for FCIC insurable crops including flue-cured tobacco, wheat, corn, and soybeans. 7 C.F.R. § 760.802. A participant on a farm is eligible for assistance under this section with respect to losses to an insurance commodity if the participant obtained a policy or plan of insurance under the Federal Crop Insurance Act for the crop incurring the losses. 7 C.F.R. § 760.806(a)(1). Where available and determined accurate by FSA, RMA loss records are used for insured crops in evaluating applications for CDP benefits. 7 C.F.R. § 760.812. The 2005, 2006, and 2007, CDP application had to be submitted on a completed FSA-840, or such

4

other form designated for such application by FSA, in the FSA county office in the participant's control county office before the close of business on a specified date. 7 C.F.R. § 760.804(a). The participant applying for benefits under the CDP must certify the accuracy and truthfulness of the information provided in the application as well as any documentation filed with or in support of the application. 7 C.F.R. § 760.804(c).

## FACTUAL BACKGROUND

15. WILLIAM LARRY ROGERS, defendant herein, a resident of Mebane, North Carolina, owned and operated W.L. Rogers Farm, LLC.

16. W.L. Rogers Farm, LLC. was a North Carolina limited liability corporation established in 2004 for the purpose of farming.

17. WILLIAM LARRY ROGERS, defendant herein, also worked as an insurance agent with Triangle Insurance Group, Inc.

18. Triangle Insurance Group, Inc. was a North Carolina corporation, established in August 2000, for the purpose of selling insurance, including multi-peril crop insurance policies for, among other crops, tobacco, soybean, corn, and wheat, and in fact, sold crop insurance policies for such agricultural commodities. Triangle Insurance Group, Inc. also sold crop-hail policies offered by private insurance companies. Triangle Insurance Group, Inc. principal place of business was located at 521 East Market Street, Smithfield, North Carolina.

19. Rural Community Insurance Services (hereinafter referred to as "RCIS") was a subsidiary of the Rural Community Insurance Company of Anoka, Minnesota, engaged in, among other things, the business of providing crop insurance services to the agriculture community. RCIS contracted with the RMA to provide federally-backed multi-peril crop insurance policies. RCIS executed a Standard Reinsurance Agreement with RMA.

20. RCIS contracted Triangle Insurance Group, Inc., to act as a local independent insurance agent for multi-peril crop insurance policies and crop hail insurance policies.

21. As a contractor of RCIS, ROGERS, through Triangle Insurance Group, Inc., was required to complete the conflict of interest form.

22. Producers Agriculture Group, Inc. (hereinafter referred to as "Pro Ag") of Amarillo, Texas, engaged in, among other things, the business of providing crop insurance services to the agriculture community.

23. Pro Ag contracted Triangle Insurance Group, Inc., to act as a local independent insurance agent for crop hail insurance policies.

24. First Mutual Insurance Group (hereinafter referred to as "First Mutual") of Smithfield, North Carolina, engaged in, among other things, the business of providing crop insurance services to the agriculture community.

6

25. First Mutual contracted Triangle Insurance Group, Inc., to act as a local independent insurance agent for crop hail insurance policies.

26. NAU Country Insurance Company (hereinafter referred to as "NAU") of Ramsey, Minnesota, engaged in, among other things, the business of providing crop insurance services to the agriculture community.

27. NAU contracted Triangle Insurance Group, Inc., to act as a local independent insurance agent for crop hail insurance policies.

28. Phillip Morris U.S.A. is an operating company of Altria Group Inc, a Virginia corporation, established for the purpose, among other things, of purchasing flue-cured tobacco from sources for processing and production of tobacco products.

29. K-Kelly Tobacco Warehouse Inc. was a North Carolina corporation, established in 1998, for the purpose of buying and selling flue-cured tobacco. K-Kelly Tobacco Warehouse, Inc. also did business under the business name of Liberty Tobacco Brokers.

30. Creekside Tobacco & Investments, Inc. (hereinafter referred to as "Creekside Tobacco") was a North Carolina corporation, established in April 2007, with its principal offices located in Angier, North Carolina. Creekside Tobacco was engaged in the business of tobacco investments.

31. The Federal Crop Insurance Corporation (hereinafter referred to as "FCIC") was a government-owned corporation, within the United States Department of Agriculture (hereinafter referred to as "USDA"), a department of the executive branch of the United States.

32. The FCIC operated through the Risk Management Agency, (RMA), which was also an agency of the USDA.

33. The FSA was an agency within USDA.

### THE CONSPIRACY

34. Beginning in September 2005, the exact date unknown, and continuing up through and including September 2011, within the Eastern District of North Carolina and elsewhere, defendant herein, WILLIAM LARRY ROGERS, did combine, conspire, confederate and agree with others known and unknown to the United States to commit offenses against the United States, to wit:

- a. to knowingly making false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change and extension of any of the same, by renewal, deferment of action and otherwise, in violation of Title 18, United States Code, Section 1014;

- b. in a matter within the jurisdiction of the Federal Crop Insurance Corporation, an agency within the United States Department of Agriculture, a department of the executive branch of the United States, in connection with the Federal Crop Insurance Program, to knowingly and willfully: (i) falsify, conceal, and cover up by any trick, scheme and devise, a material fact; and (ii) make

8

materially false, fictitious, and fraudulent statements and presentations; and (iii) make and use any false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements, in violation of Title 18, United States Code, Section 1001;

c. having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme or artifice and attempting to do so, to place in any post office and authorized depository for mail matter, any matter and thing whatever to be sent or delivered by the Postal Service, and to knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of Title 18, United States Code, Section 1341;

d. having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire in interstate commerce, that is, by electronic mail and facsimile, writings, signals and sounds, in violation of Title 18, United States Code, Section 1343; and

e. to corruptly endeavor to influence, obstruct, and impede the due administration of justice, in violation of Title 18, United States Code, Section 1503.

## PURPOSE OF THE CONSPIRACY

35. It was the purpose of the conspiracy to profit through the filing of false, fictitious and fraudulent federal crop insurance claims and private crop hail claims, the sale of unreported tobacco, and to hide the criminal proceeds through payments in nominee names. It was further a part of the conspiracy

9

to obstruct the investigation by lying and directing others to lie to law enforcement officers and a federal grand jury.

## MANNER AND MEANS

36. In furtherance of the conspiracy, defendant herein, WILLIAM LARRY ROGERS, along with others, employed the following manner and means:

   a. WILLIAM LARRY ROGERS, on behalf of W.L. Rogers Farms, LLC, entered into a contract with Phillip Morris for sale of tobacco each year, from 2005 through 2011.

   b. Co-conspiring farmers obtained or caused to be obtained federal crop insurance policies for their tobacco crops through their insurance agent, WILLIAM LARRY ROGERS.

   c. During the growing season, WILLIAM LARRY ROGERS and the co-conspiring farmers discussed how to manipulate their crop production to reflect a loss, when, in fact, they did not sustain a loss.

   d. WILLIAM LARRY ROGERS would take tobacco production from the co-conspiring farmers and sell the tobacco on the W.L. Rogers Farms, LLC contracts with Phillip Morris. As a result, the co-conspiring farmers were able to hide some or all of their tobacco production.

   e. WILLIAM LARRY ROGERS and the co-conspiring farmers then filed false crop insurance claims.

f. The co-conspiring farmers profited under the scheme because they were paid twice for each pound of tobacco: once through the false crop insurance claim, and also through the sale of the unreported ("hidden") tobacco.

g. WILLIAM LARRY ROGERS profited through other aspects of the double sales scheme, including the original insurance commission, collecting a share of the hidden tobacco's second sale, and profit margins derived from subsequent sales of the tobacco.

h. The co-conspiring farmers who sold the unreported ("hidden") tobacco misrepresented the truth of farm operations in a variety of documents that were submitted to the private insurance entities. For example, documents, including applications, reports of actual production history, acreage reports, and claim forms made and submitted in support of crop insurance coverage and claims, failed to truthfully show who had an insurable interest and who really suffered a loss and the extent of that loss.

i. In some instances, the conspirators, including WILLIAM LARRY ROGERS, falsely allocated loss and harvest amounts on Production and Yield Reporting Forms and Production Worksheet reports. That is, to fraudulently establish losses on some insured farms, the co-conspirators engaged in a practice of "yield shifting" that is, falsely reporting that the farmer had harvested very small quantities from the insured farm for which a claim was

11

being filed and falsely reporting much larger production per acre from other farms or other entities.

j.  WILLIAM LARRY ROGERS, as an independent contractor for Triangle Insurance Group, Inc., wrote crop-hail insurance policies from private insurance companies such as RCIS, Producers Ag Insurance Group Inc., First Mutual Insurance Company, and NAU Country Insurance Company.

k.  WILLIAM LARRY ROGERS then instructed a co-conspirator/adjuster to exaggerate the loss amount on the Proof of Loss in connection with crop-hail claims. WILLIAM LARRY ROGERS and/or the co-conspirator then would execute Proof of Loss form, knowing that the loss amounts were exaggerated.

l.  A co-conspirator would either mail or caused to be mailed, through the U.S. mail, the insurance claim forms, or would submit the claim forms by electronic mail.

m.  Co-conspiring farmers received payment on the fraudulent federal crop insurance claims through their insurance company and/or insurance agency which would be reimbursed for the payments by USDA, the ultimate victim of the federal crop insurance fraud offenses.

n.  Co-conspiring farmers received payment on the crop hail claims through their insurance company and/or insurance agency, the ultimate victim of the false crop hail claims.

12

o. WILLIAM LARRY ROGERS further failed to disclose conflicts of interests to the private insurance companies and RMA.

p. Between 2005 and 2010, WILLIAM LARRY ROGERS caused to be paid a total of $7,359,197 worth of federal crop insurance indemnity payments to his insureds, and a total of $1,022,181 worth of crop hail indemnity payments to his insureds.

## OVERT ACTS

37. In furtherance of the conspiracy, and to effect the object thereof, there were committed by at least one of the co-conspirators in the Eastern District of North Carolina and elsewhere at least one of the following overt acts, among others:

### FALSE STATEMENTS REGARDING CONFLICT OF INTERESTS

a. On or about October 20, 2005, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2) selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

b. On or about September 8, 2006, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2)

13

selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

  c. On or about September 12, 2007, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2) selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

  d. On or about August 1, 2008, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2) selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

  e. On or about September 7, 2009, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2)

14

selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

f. On or about August 23, 2010, WILLIAM LARRY ROGERS executed and submitted to RCIS a written conflict of interest form representing that he had no business relationships with any of his insureds when, in fact, when, in fact, he was, among other things, (1) buying and selling tobacco with and through his insureds; (2) selling gas and fertilizer to his insureds; (3) loaning equipment to his insured; and (4) employing his insureds as contract employees.

CO-CONSPIRING FARMER "E.H."

g. On or about October 11, 2007, WILLIAM LARRY ROGERS sold $2,652.72 worth of hidden tobacco on W.L. Rogers Farms,LLC's contract with Phillip Morris and did so on behalf of co-conspiring farmer "E.H." ROGERS caused the proceeds of the sale to be paid by check in a nominee name with the initials "R.S."

h. On or about October 24, 2007, WILLIAM LARRY ROGERS sold $11,092.13 worth of hidden tobacco on W.L. Rogers Farms, LLC's contract with Phillip Morris and did so on behalf of co-conspiring farmer "E.H." ROGERS caused the proceeds of the sale to be paid by check in a nominee name with the initials "P.G."

i. In the fall of 2007, the exact date unknown, WILLIAM LARRY ROGERS shifted "E.H." crop production, including shifting

15

production to another producer with initials "J.H.", all in order to create the appearance of a loss when in fact "E.H." suffered no loss that year.

j. In May 2008, WILLIAM LARRY ROGERS told "E.H." to lie to federal investigators.

### CO-CONSPIRING FARMER "M.T."

k. On or about October 31, 2007, WILLIAM LARRY ROGERS caused to be sold $19,387.00 worth of hidden tobacco at Creekside Tobacco and did so on behalf of co-conspiring farmer "M.T."

l. On June 2, 2008, "M.T." provided false and misleading information to law enforcement officers.

### CO-CONSPIRING FARMER "T.G."

m. In 2006, co-conspiring farmer "T.G." obtained a contract with Phillip Morris to sell 75,000 pounds of tobacco through Wilson Tobacco Services receiving station in Wilson, North Carolina.

n. On September 11, 2006, WILLIAM LARRY ROGERS negotiated a $8,778.38 check issued to "T.G." from Phillip Morris in connection of the sale of hidden tobacco on the "T.G." contract.

o. On September 21, 2006, WILLIAM LARRY ROGERS negotiated a $8,310.21 check issued to "T.G." from Phillip Morris in connection of the sale of hidden tobacco on the "T.G." contract.

### CO-CONSPIRING FARMER "R.E."

p.  On or about September 7, 2006, WILLIAM LARRY ROGERS sold $15,556.38 worth of hidden tobacco on his Phillip Moriss contract.

q.  On or about September 11, 2006, WILLIAM LARRY ROGERS causes to be issued two consecutive checks in the amounts of $5,000.00 and $4,165.60, drawn on W.L. Rogers Farms, LLC's account and payable to co-conspiring farmer "R.E."

r.  On or about November 25, 2006, WILLIAM LARRY ROGERS and co-conspiring farmer "R.E." falsely certified a Production Worksheet and caused RMA, through an private insurance company, to issue an indemnity check to "R.E." in the amount of $32,096.

s.  On or about December 7, 2006, co-conspiring farmer wrote a check to WILLIAM LARRY ROGERS in the amount of $8,041.00.

t.  On March 23, 2011, "R.E." provided false and misleading information to law enforcement officers, and denied that he sold tobacco to and through WILLIAM LARRY ROGERS.

### CO-CONSPIRING FARMER "J.L.C."

u.  On or about May 9, 2009, co-conspiring farmer "J.L.C." falsely reported to FSA that he was the 100 percent shareholder in 20 acres of land on which 40,000 pounds of tobacco would be grown, thereby securing a farm loan.

v.  On or about May 1, 2009, co-conspiring farmer "J.L.C." obtained a contract with U.S. Tobacco Cooperative, Inc. to

17

sell 40,000 pounds of tobacco through receiving stations Rural Hall, North Carolina, and South Hill, Virginia.

w. Between August 25, 2009, and October 28, 2009, WILLIAM LARRY ROGERS sold at least 75,000 pounds of tobacco on farmer "J.L.C.'s" contract.

x. Between August 27, 2009, and September 22, 2009, WILLIAM LARRY ROGERS deposited and caused to be deposited into his bank account at least $84,000 worth of checks issued to co-conspiring farmer "J.L.C." from U.S. Tobacco Cooperative.

y. Between October 7, 2009, and October 29, 2009, "J.L.C." deposited at least $50,000 worth of checks from U.S. Tobacco Cooperative, and thereafter, purchased official bank checks totaling $30,909.26 payable to WILLIAM LARRY ROGERS.

z. Between October 9, 2009, and October 29, 2009, WILLIAM LARRY ROGERS deposited the $30,909.26 worth of official bank checks into his bank account.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO
(False Statements to Federal Crop Insurance Corporation, and aiding and abetting, 18 U.S.C. §§ 1014 and 2)

1. Paragraphs 1 through 33 and 36 of Count One above are hereby re-alleged and incorporated by reference.

2. On or about November 8, 2007, in the Eastern District of North Carolina, defendant herein, WILLIAM LARRY ROGERS, aiding and abetting another, knowingly made and caused to be made a false statement and report for the purpose of influencing in any way the

18

actions of the Federal Crop Insurance Corporation (FCIC), and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, that is, upon application for the payment of crop insurance benefits to a farmer known to the United States as "E.H," through the farmer's business entity, the defendant misstated and caused to be misstated the true tobacco production and other facts in connection with the loss claim, in violation of Title 18, United States Code, Sections 1014 and 2.

THOMAS G. WALKER
United States Attorney

BY: BANUMATHI RANGARAJAN
Assistant United States Attorney
Criminal Division